South East National Bank of Chicago, Appellee, v. Board of Education of the City of Chicago et al.

Charles B. Scoville, Jr., Trustee of Estate of Charles B. Scoville, Deceased, Appellee, v. Board of Education of the City of Chicago et al. Waukesha Lime and Stone Company et al., Appellants.

Gen. No. 40,352.

Opinion filed December 30, 1938.

POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND and D'ANCONA, PFLAUM & KOHLSAAT, both of Chicago, for appellants; EDWARD R. JOHNSTON and ALBERT E. JENNER, JR., of Chicago, of counsel.

JOSEPH SULLIVAN, MAYER GOLDBERG and BENTON ATWOOD, all of Chicago, for certain appellees.

WILLIAM A. ROGAN and JOSEPH A. RICKER, both of Chicago, for certain other appellees.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

On June 21, 1938, at the instance of plaintiffs and intervenors, as holders and owners of $122,000 of unpaid tax warrants of the Board of Education of the City of Chicago, the circuit court of Cook county entered an order directing a temporary injunction to issue, restraining one group of respondents from seeking to enforce two money decrees, totalling $6,477,214.65, theretofore entered by the circuit court of Cook county against the Board of Education in two separate actions in favor of 286 plaintiff-holders (including 82 of the parties to these consolidated appeals) of $5,825,000 of unpaid 1929 tax anticipation warrants of the Board; another group of respondents from further prosecuting nine other proceedings brought by eleven holders (including seven of the parties to these consolidated appeals) of $820,000 of unpaid warrants against the Board of Education in the circuit and superior courts of Cook county, such proceedings being similar in character to the proceedings in which the money decrees were entered, and all holders of unpaid warrants from instituting further like proceedings against the Board upon any of the remaining $1,100,000 of unpaid 1929 tax anticipation warrants not already in suit, and from such interlocutory order respondents prosecute

this and four other appeals. This appeal was consolidated for hearing with the appeals in cases Nos. 40,353, 40,354, 40,355 and 40,356.

In January, 1929, the city council of the city of Chicago, under the direction of the Board of Education, levied taxes for the year 1929 for educational, building and playground purposes, such levies being for the sums of $83,800,000, $37,813,000 and $975,000, respectively. On January 21, 1929, the city council, on request of the Board, authorized the issuance and sale of tax anticipation warrants drawn against and in anticipation of the collection of such tax levies in a sum not to exceed 75 per cent of the total amount of the respective levies. The warrants were payable solely from taxes when collected, and bore interest at 6 per cent per annum. From January to April, 1929, educational fund warrants in the aggregate amount of $46,800,000 were issued; on July 1, 1929, building warrants in the amount of $15,900,000 were issued, and $475,000 of playground fund warrants were also issued. The building and playground warrants were issued in one series, consecutively numbered, and in denominations of $1,000 and $5,000. The educational fund warrants were issued in two series, each series numbered consecutively, and the first aggregated $13,500,000 and the second $33,300,000. The majority of the educational fund warrants were in denominations of $1,000 and $5,000. A few of them were in denominations varying from $10,000 to $250,000. The warrants bore various maturity dates from July 1, 1930, to and including September 15, 1930. Although the taxes were levied and the warrants issued during the period from January through July, 1929, the taxes were not extended by the county clerk until the spring of 1931. The delay was caused by the reassessment of all property in Cook county ordered by the State Tax Commission in the year 1928. The three tax

levies were extended by the county clerk for collection, as follows:

| Tax Purpose | Total Extension | Loss and Cost of Collection | Net Tax |
|---|---|---|---|
| (1) Educational | $54,386,937.12 | $5,438,693.71 | $48,948,243.41 |
| (2) Building | 18,472,493.53 | 1,847,249.35 | 16,625,244.18 |
| (3) Playground | 554,174.80 | 55,417.48 | 498,757.32 |

The taxes were not put into collection until May, 1931, at which time the principal and accrued interest in each case exceeded substantially the probable net collectible tax. In the meantime the world-wide depression had set in, rendering the collection of taxes more difficult. The tax collections never equaled the principal amounts of warrants issued. The building and playground warrants were called and paid in numerical order. Of the educational warrants the first series was first retired. As to the second series the calls were for the most part for the retirement of the warrants in numerical order. Because of the serial method of payment the higher numbered warrants were not paid and are still outstanding. The lower numbered warrants were paid in full with accrued interest, to the exhaustion of the proceeds of the tax collections received. Of the educational warrants approximately $7,000,000 principal amount remain outstanding and unpaid. Of the building fund warrants approximately $2,900,000 principal amount remain outstanding and unpaid, and $65,000 remains outstanding and unpaid on the playground warrants. Interest had accrued on the unpaid educational warrants in the sum of $3,000,000, on the unpaid building warrants the sum $1,000,000, and on the unpaid playground warrants the sum of $35,000. By 1933 it became evident that the three tax funds would never be sufficient to pay the outstanding unpaid warrants and accrued interest in full. The legislature, in 1933, passed an act authoriz-

ing the Board to issue its general obligation bonds in an amount sufficient to pay the outstanding 1929 warrants in full, both as to principal and interest. The act was held unconstitutional in *Berman v. Board of Education,* 360 Ill. 535 (April, 1935). The great bulk of the payments on a *pro tanto* basis took place in the period 1931–1933, with a few payments in 1934 and the first five months of 1935. The *Berman* case concluded the first phase of the attempt to solve the 1929 Board of Education tax warrant problem. In chronological order, the next step was a proceeding filed in the United States District Court on July 14, 1935, by the Norfolk & Western Railway Company against the Board of Education, in which the railway sought, as the holder of $858,000 of unpaid educational and building warrants, (1) an accounting from the Board of the proceeds of the 1929 educational and building tax levies received by it, (2) a money decree against the Board for the *pro rata* share of such tax proceeds which it asserted should have been paid to it by the Board, and (3) an injunction against the Board restraining it from distributing 1929 tax proceeds then in its possession or collected in the future, other than upon a *pro rata* basis among the owners and holders of all outstanding unpaid warrants. The cause was tried before Hon. Charles E. Woodward, who on April 17, 1936, rendered his written opinion sustaining the railroad's contentions. (*Norfolk & Western Ry. Co. v. Board of Education,* 14 F. Supp. 475.) He held that the warrants were payable solely from the proceeds of the taxes when received; that the tax proceeds upon receipt became and were a trust fund in the possession of the Board as trustee to which all warrant holders had equal title, so as to be entitled to *pro rata* distribution of the funds, and that when the Board, instead of distributing the trust fund equally among all warrant holders, distributed it among but a part

of the warrant holders in full payment of the warrants held by them, to the damage of the remaining warrant holders, who received nothing because of the exhaustion of the tax funds by such method of distribution, it committed a breach of trust for which it was personally liable to holders of unpaid warrants as and for money had and received, in a sum equal to the amount which the unpaid warrant holder would have received had distribution been made *pro rata.* On May 4, 1936, a decree was entered by Judge Woodward in conformity with the opinion. The decree fixed the basis of recovery as "the proportion of all the moneys received as the proceeds of said . . . levy which the total amount of . . . warrants owned and held by plaintiff bears to the total amount of warrants issued against said . . . levy." On appeal the circuit court of appeals, on February 10, 1937, sustained the decree of the district court with one exception. Whereas the district court had enjoined the Board from distributing present and future tax proceeds other than on a *pro rata* basis, the circuit court of appeals held that the district court should have entered a mandatory decree directing immediate "payment of the taxes collected and on hand or hereafter to be collected to the satisfaction of outstanding warrants"; the distribution to be "among the warrant holders in the proportion which each warrant holding interest bears to all the outstanding unpaid bonds," and that "for the balance due on an accounting a money decree should be entered in appellee's favor against the board." On May 19, 1937, pursuant to the mandate of the circuit court of appeals, a supplemental decree was entered in the district court directing the Board upon appropriate published notice "promptly to distribute all moneys now in its hands or under its control, or which may at any time come into its hands or under its control as the proceeds of the collection

of taxes levied for the year 1929 . . . among all warrant owners and holders of unpaid 1929 educational and building tax anticipation warrants proportionately and ratably in the proportion which the amount of each respective warrant owner holding interest . . . respectively bears to the amount of all outstanding and unpaid . . . warrants . . . remaining from time to time unpaid, such distribution . . . to be in each instance'' exhaustive of the funds then on hand. On June 10, 1937, and March 1, 1938, pursuant to the supplemental decree, the Board made two *pro rata* distributions of accumulated 1929 tax funds applicable to 1929 educational, building, and playground warrants, aggregating $270 on each educational warrant, $220 on each building warrant, and $415 on each playground warrant. Each of the plaintiffs and intervenors received his *pro rata* distribution upon the warrants held by him. The accounting against the Board ordered in the original and supplemental decree was taken before master in Chancery Irving R. Herriott, during the fall and winter of 1937–38, and on May 15, 1938, he rendered his report. The master recommended that there be allowed statutory interest at 5 per cent on each amount which should have been paid to the warrant holder from the date when each *pro rata* payment should have been made. The 6 per cent interest recited on the face of the warrant was allowed upon the full principal amount of each warrant to the date of first distribution, and thereafter upon the balance of principal which would have remained from time to time had *pro rata* distribution been made. The report was filed May 27, 1938, and is now pending for disposition.

On February 22, 1936, 71 owners and holders of unpaid educational and building warrants filed their complaint in equity in the circuit court in the cause entitled *Chicago City Bank and Trust Company et al. v. Board*

*of Education et al.* That cause involved warrants in the principal amount of $2,007,000, of which $1,587,000 were educational warrants and $420,000 were building warrants. On July 18, 1936, a proceeding identical with the *Norfolk & Western Ry. Co.* case was filed in the United States District Court by five holders of $1,382,000 unpaid warrants, of which $587,000 were educational and $795,000 were building warrants. This cause, entitled *Union Trust Co. of Pittsburgh et al. v. Board of Education,* was heard before Judge Woodward and a decree, as in the *Railway* case, was entered on July 13, 1937. The accounting was taken at the same time as in the *Railway* case and the master's report in the latter case applies to the *Union Trust Company* case. On September 9, 1936, a case entitled *Irving K. Hutchinson et al. v. Board of Education et al.* was filed in the circuit court by 213 holders of $3,048,000 educational warrants, $730,000 building warrants, and $30,000 playground warrants. Respondent Commerce Trust Company filed its action in the circuit court on August 19, 1936, alleging ownership of $260,000 of educational warrants. Plaintiff South East National Bank of Chicago filed its complaint on August 2, 1937, which was more than two years after the *Railway Company* case, more than a year after the published opinion rendered in that case by Judge Woodward, and more than a year after the filing of the *Chicago City Bank* and the *Hutchinson* cases. South East Bank asserted ownership of four educational warrants aggregating $16,000. The complaint sought judgment only against Board of Education and on the same basis as was urged in the other cases. Respondent Louis Oppenstein, claiming ownership of $25,000 educational warrants and $5,000 building warrants, filed his action in the circuit court August 19, 1937; and the Diamond Coal Co., as holder of $5,000 educational warrants, filed its suit in the cir-

cuit court October 10, 1937. Plaintiff Charles B. Scoville, Jr., filed his complaint in the circuit court on November 17, 1937, more than two years after the *Railway Company* case was filed, almost one and one-half years after the opinion and decree of Judge Woodward, ten months after the opinion of the circuit court of appeals, and almost two years after the filing of the *Hutchinson, Chicago City Bank* and *Commerce Trust Company* cases. Scoville asserted ownership of six building warrants aggregating $30,000. His first count sought judgment against the Board on the same basis as in the other cases. Subsequent to the Scoville suit, and in February, March and April, 1938, five additional suits (including the separate suits of five of the respondents who join in these appeals) were filed—four in the circuit court and one in the superior court—by eight separate plaintiffs, alleging ownership of $380,000 of educational warrants, $110,000 of building warrants, and $35,000 of playground warrants. Cochran and Jacobs, who also petitioned for the injunction, did not intervene until December 10, 1937, and March 18, 1938, respectively. They alleged that they were the owners of educational warrants in the sums of $1,000 and $75,000, respectively. Cochran acquired his warrants in December, 1937, and Jacobs, in March, 1938. The South East Bank and Scoville complaints were filed by plaintiffs on their own behalf and on behalf of all other owners and holders of the 1929 tax anticipation warrants of the Board. The original complaint in the *South East Bank* case was a one count case and sought a money decree. It was similar to and sought the same relief as the other cases which were then pending. On November 19, 1937, an amended complaint, consisting of two counts, was filed. The first count was a repetition of the original complaint. This pleading recited that it was brought on behalf of the plaintiff and all holders and owners of

outstanding unpaid educational warrants and asked a
money decree against the Board for the separate *pro
rata* amounts of taxes due each holder of unpaid
educational warrants, and that the respective amounts
so found due be required to be paid by the Board to a
receiver to be appointed by the court, who was there-
after to "discover" the owners of the unpaid educa-
tional warrants and to distribute the proceeds of any
decree or decrees which might be entered against the
Board. The pendency of the *Railway*, the *Chicago
City Bank* and *Oppenstein* cases was alleged and an
injunction against further prosecution thereof asked.
An injunction was also sought to prevent all other
holders of educational warrants from instituting or
prosecuting any suit seeking the same relief against
the Board as was being sought under count I. It was
also alleged that all holders of unpaid educational
warrants had claims against the Board of a nature
and character similar to those of plaintiff; that all of
the other holders had a common interest in the sub-
ject matter of the suit, in said funds derived from the
collection of taxes for the year 1929 for educational
purposes, and in causes of action asserted and recov-
eries to be effected therein; that such other persons
constituted a class with plaintiff having claims with
plaintiff involving common questions of law and fact;
that with the filing of the complaint the court had
obtained prior and exclusive jurisdiction of the sub-
ject matter of the proceeding and was therefore en-
titled to retain the same against any and all proceed-
ings which might be subsequently filed to enforce the
same causes of action, and which have been filed for
the purpose, if they be not representative in char-
acter; that injunctive relief was necessary to protect
and preserve such jurisdiction and to insure orderly
procedure in the prosecution of the causes of action
stated in the complaint, and in the distribution of

recoveries; that the other cases pending against the Board were not representative in character, although they were brought to enforce the same cause of action against the Board as plaintiff sought to enforce in its suit; that plaintiff was required to employ experienced and competent counsel, to whom it had become liable for reasonable fees, and that plaintiff was entitled to be reimbursed for its attorneys' fees, costs and expenses, out of the proceeds of any collections recovered in the action. Count II sought recovery on behalf of plaintiff and all other owners and holders of unpaid 1929 educational warrants from those former owners and holders of 1929 educational warrants who had been paid in full by the Board, for the excess of the proceeds of the 1929 educational tax funds received over and above the amount which such "paid" warrant holders would have received had the tax fund been distributed *pro rata*. On the same day that the amended complaint was filed in the *South East Bank* case, Scoville filed his complaint, consisting of two counts, identical with the amended complaint in the *South East Bank* case, except that it was confined to building warrants. On December 10, 1937, the *South East Bank* and *Scoville* cases were consolidated. On December 11, 1937, an order was entered in the consolidated causes appointing Arthur R. Thompson receiver and authorizing him to collect and receive the excess of tax funds received by "paid" warrant holders from the Board, to receive any and all other moneys, securities and property which may be ordered paid to him, and granting leave to retain attorneys. On March 4, 1938, counts II of the consolidated complaints were amended so as to add additional parties defendant. Such additional parties were alleged to have held 1929 building and educational warrants which had been paid in full as to principal and interest. On March 4, 1938, an order was entered setting the

first count of the consolidated proceedings for trial. The trial began April 13, 1938. Plaintiffs' proofs were completed April 15, 1938, and defendants' proofs thereafter. On May 20, 1938, plaintiffs moved for the entry of a money decree based on count I, against the Board and in favor of plaintiffs, for the individual *pro rata* amounts, and the motion was taken under advisement. Certain defendants to counts II filed motions to dismiss and strike that count, which motions were argued orally. On May 24, 1938, the motions to dismiss were overruled and such defendants, on June 13, 1938, filed their answers. There are 47 individual defendants to count II in the *South East Bank* complaint and 67 defendants to count II of the *Scoville* complaint. The answers are of great length. One of the major defenses in all the answers is that the particular bank, investment house or trust company charged with having received payment in full on warrants, in fact acted merely as agent for other persons, firms and corporations, for the purpose of collecting from the Board and distributing the same to their principals. The answers of six banks and investment houses state that collections were made on behalf of 822 different owners and holders of educational and building warrants over a period from June, 1931, to April, 1935, the bulk thereof taking place in the years 1931, 1932 and 1933. The answers set forth the residences of each of the persons, firms and corporations on whose behalf collection was made, showing that they reside in practically every State in the union. Each answer also attacked the validity of the consolidated cases as proper representative actions, and urged the statute of limitations and laches and estoppel. They also asserted good faith in making the collections, and lack of any knowledge respecting any claim of wrongdoing. The answers also asserted that plaintiffs and others on whose behalf plaintiffs brought

suit acquired their warrants subsequent to the time payments were made to defendants either on their own account or for the account of others; that the Board was solvent and fully financially responsible, and that plaintiffs had as much knowledge concerning the levy, collection and distribution of the tax funds as did defendants.

On May 3, 1938, Cochran and Jacobs filed their verified petition for an injunction asking that the further prosecution of all pending actions, except the *Railway, Hutchinson* and *Chicago City Bank* cases, be enjoined, and also asking an injunction against all other holders of educational warrants, restraining them from instituting actions against the Board. The right to an injunction was based upon the theory that the consolidated causes were representative proceedings while the other pending cases were not. Notice of the presentation of the petition was given to various defendants. On May 20, 1938, a separate verified petition for injunction was filed by plaintiffs. Such petition sought to enjoin the further prosecution of all pending suits, the institution of further actions, and the enforcement of the money decrees. The petition asked that the temporary restraining order remain in effect until the entry of final decrees upon the issues raised under counts II of the consolidated complaints. In support of plaintiffs' application for injunction it was alleged that the purpose of the consolidated causes was to enforce the liability of the several defendants so as to replenish and restore the tax trust fund dissipated by the Board; that such liabilities and recoveries would take the place of the dissipated fund, and that the aggregate of all the liabilities of the defendants and all moneys collected thereon, constitute a trust fund for the equal and common benefit of all owners and holders of said unpaid tax anticipation warrants; that the trust fund should be collected, ad-

ministered and distributed by the court for the equal and common benefit of all of the owners and holders on whose behalf the case is being maintained, and that the case involves the administration of a trust, the trust *res* or estate being the liabilities of all defendants; that the original tax fund was insufficient to pay all outstanding warrants; that the trust fund composed of the liabilities of all the defendants in each of the consolidated cases, would likewise be insufficient to pay in full the amounts due on the unpaid warrants; that the tax funds on hand with the Board and the aggregate of liabilities were the only sources for payments on the outstanding warrants; that the ''Board . . . is unable presently to pay any part of any decree which may be rendered against it herein; . . . that full collection of any decree against said Board . . . may not be made for many years; . . .'' that many of the defendants under count II were insolvent; that the taxes on hand and the aggregate of liabilities must be collected and distributed and disbursed equally among all holders of unpaid warrants so that none of them shall obtain an unfair preference either as to amount or time of payment; that all holders of outstanding warrants have a common and identical interest in the question of fact and law involved, in the controversy presented, in the relief sought, in the liabilities and trust fund to be collected, and in the trust to be administered in each of said consolidated cases; that the owners and holders of outstanding warrants numbered several hundred; that they were scattered throughout the United States; that many of them could not be reached through the service of process; that the warrants which are payable to bearer were being constantly transferred, and that the identity and whereabouts of the present owners and holders were unknown to plaintiffs; that it would therefore be impracticable and actually impossible to join all of the holders of outstanding warrants; that the liabilities

of all defendants must be adjusted and marshaled as between them, and the trust or common fund must be marshaled as to the rights or liabilities of all persons interested; that the liability of the Board to certain holders of unpaid warrants will be reduced *pro tanto* by any payment by other defendants on account of their liability; that such marshaling and adjustment of liabilities could only be made in a representative suit in equity on behalf of all claimants and holders of unpaid warrants; that by the filing of the representative suits the court had obtained prior and exclusive jurisdiction *in rem* over the administration of the purported trust involved, to the exclusion of the other pending suits which were not class or representative suits, and which did not attempt to marshal the claims against the Board and the paid warrant holders; that with the filing of the original complaint in the *South East Bank* case on August 2, 1937, the court had acquired complete and exclusive jurisdiction of the trust *res* composed of liabilities of all defendants to such an extent that no other court had power or jurisdiction at any time thereafter to enter any judgment or decree in favor of any owner or holder of said unpaid tax anticipation warrants; that certain claimants might procure decrees for more than their proportionate interest of the alleged fund or liability; that the plaintiffs in the Federal cases seek to obtain a larger percentage of said liability than was decreed in the State cases; that the plaintiffs who have already obtained decrees may have been decreed a larger percentage than will ultimately be decreed to plaintiffs in the consolidated cases; that some of the plaintiffs in the pending suits and some of the plaintiffs who have obtained decrees have been paid in full as to some warrants once held by them, and that they would therefore procure an unfair advantage in not being required in their individual suits to account for and pay over moneys received by them in excess of

their *pro rata* share; that warrant holders in other suits would procure a priority as to time of payment, and that they would be able to enforce their prior judgments or decrees and procure satisfaction before any judgment or decree might be entered in the consolidated cases; that counsel representing plaintiffs in the other pending suits had knowledge of the pendency of the representative proceedings, but had continued to prosecute said other cases and to obtain money decrees.

The parties plaintiff in the two Federal cases filed petitions for injunction before Judge Woodward seeking to enjoin plaintiffs and intervenors in the consolidated cause from interfering with the prosecution of the Federal cases or the enforcement of the decrees. Plaintiffs appeared, answered and defended against the application for an injunction. Nevertheless, on June 6, 1938, Judge Woodward found the issues against plaintiffs in the consolidated cause and on June 13, 1938, enjoined them as prayed. Judge Woodward found that both counts in the consolidated cases sought to enforce claims *in personam* and not *in rem;* that the liability of the Board was personal, which was likewise true of the liability, if any, of the "paid" warrant holders; that the relief sought in the Federal cases was confined to relief against the Board; that an attempt was being made in the consolidated cases to assert a liability against the paid warrant holders; that the further prosecution of the Federal court actions would in no wise interfere with the jurisdiction of the circuit court in the consolidated cases, nor with the orderly and due prosecution thereof, and that the parties in the Federal cases had a right to continue to maintain their causes free from interference by plaintiffs. Plaintiffs and coplaintiffs in the consolidated cause prosecuted an appeal from the district court to the circuit court of appeals, where it is now pending. Verified answers to the petitions for injunctions were

filed by the loop banks and by the Board. The Board alleged that the other pending cases were being actively prosecuted; denied that the rights of plaintiffs in the other cases could be adequately determined in the consolidated cause; and alleged that the consolidated cause was entirely different from the other cases, and that the consolidated cause was not a representative proceeding. Bertha D. Baur filed her answer and alleged that she was proceeding solely against the Board; that the Board was not insolvent but was fully able to meet and discharge its obligations; that the liability of the Board to her was a personal liability, primary and absolute and not subordinate to or contingent or dependent upon the liability, if any, of persons who received 1929 tax moneys in payment and discharge of their warrants; that the further prosecution of her suit would in no way interfere with the consolidated causes, and that in any event she held and was suing upon $35,000 of playground warrants which the consolidated causes did not purport to cover. No answers or appearances were filed on behalf of the parties in the remaining pending cases other than the *Waukesha Lime & Stone Co.* and *Hutchinson* cases. However, the 71 plaintiffs in the *Chicago City Bank* case and the plaintiffs in the *Commerce Trust, Oppenstein, Levin* and *Tauchen* cases have joined in the prosecution of these consolidated appeals. Some respondents filed special and limited appearances supported by affidavits showing that they have not been personally served with summonses or with notice and that they were not parties defendant to the consolidated causes. Henry Crown filed a verified answer to each petition, the allegations of which are substantially the same as heretofore outlined. The Crown answer also sets forth that the *Waukesha* case was filed in April, 1938; that on the very day the Cochran petition for injunction was filed, a final decree, which had been checked and approved by counsel

for the Board, was presented to Judge Prystalski for entry; that the proffered decree was not entered only because the petition for an injunction was filed. Each of the three parties to the *Waukesha* case has joined in these consolidated appeals. Of the 213 parties to the *Hutchinson* case, in whose favor money decrees had been entered April 13, 1938 (*nunc pro tunc* as of April 1, 1938), special and limited appearances were filed by H. Earl Hoover of Chicago, Emile Kahn of New Orleans and Automobile Club of Michigan, a Michigan corporation, holders of $55,000 of warrants, all of whom are parties to these appeals. The supporting affidavit stated that none of said persons had been served with summons, process or other notice and specifically recited that the employment of attorneys on whom notice was served, had terminated on April 18, 1938, prior to the service of notice, and that said attorneys had no right or authority to represent such specially appearing respondents. A detailed, verified answer was filed on behalf of various other parties to the *Hutchinson* case. The answer alleged that respondents had no knowledge of the pendency or progress of the consolidated causes other than such as they had gathered from an examination of the court files preliminary to filing their answer; denied that the consolidated causes were proper representative proceedings or that plaintiffs therein were asserting or could assert any cause or causes of action on behalf of respondents; alleged that the ''aggregate of liabilities'' theory of representative suit was legally unsound; that the causes of action sustained by respondents in the *Hutchinson* case and the causes of action asserted in the consolidated causes were purely personal actions and did not and could not involve or constitute a trust *res*; that in any event respondents were not and could not interfere with counts II as none of their actions sought to enforce the purported

causes of action set up therein; denied that the Board was presently unable to pay money decrees entered and to be entered against it, but asserted that any such decrees would promptly be paid; alleged that aside from the fact that the Board was a municipality having power to levy taxes to pay any judgments entered against it, the money decrees against the Board would promptly be paid by virtue of an Act of the Illinois General Assembly, in force July 20, 1937, authorizing the Board to issue its bonds to pay (from the proceeds of sale thereof) the money judgments or decrees entered against it in respect of the unpaid tax warrants; that on April 20, 1938, promptly following the entry of the two money decrees in the *Hutchinson* and *Chicago City Bank* cases (aggregating $6,478,114.65) the Board had proceeded to adopt the resolutions necessary to issue $6,595,393.26 of its 3½ per cent bonds pursuant to the act, so as to pay said money decrees (upon which interest at 5 per cent is accruing) with the proceeds of the sale of the bonds; that the resolution, together with a form of ordinance to be adopted by the city council authorizing the issuance of the bonds, had been deposited with the city clerk and referred to the finance committee of the city council for approval, before which committee the same was pending at the time the petitions for injunction were filed; that the plaintiffs' attorneys in the consolidated cases were attorneys for the 71 parties plaintiff in the *Chicago City Bank* case and knew of the pendency of that case and of the progress thereof from the time it was filed in February, 1936, to the entry of the decree in March, 1938; that although full knowledge of pending litigation was had by the three counsel for plaintiffs from the day of the filing of the *Chicago City Bank* case (in which one was a party, another an active counsel for the warrant holders, and the last an employee of an "at-

torney-party,'' actively reporting the course of progress of all suits), no attempt was made to enjoin the other actions until May, 1938, more than 27 months after such counsel instituted, took part in, and prosecuted to decree one of the cases sought to be enjoined; that two *pro rata* distributions of current tax collections in June, 1937, and March, 1938, made pursuant to the supplemental decree entered by Judge Woodward, were accepted by plaintiffs; that upon the entry of the final decrees in the *Hutchinson* and *Chicago City Bank* cases there was stamped by the Board upon the $5,815,000 of warrants involved in those cases a notice of the entry of judgment; that respondents in the *Hutchinson* case had employed counsel who had proceeded with the cause, had secured the entry of a final money decree of $4,243,707.63, and had been paid in full for their services; that expensive and costly proceedings had been had in the *Chicago City Bank* case, and a final decree of $2,234,407.02 secured; that the effect of the injunction would be merely to force respondents and their coparties to pay considerable expenses and an additional and wholly unnecessary fee to the attorneys for plaintiffs and intervenors and to the receiver and his attorney for doing over again the work which respondents' attorneys had already completed; that an attorney who acted as counsel in the *Chicago City Bank* case would receive double payment, once for having secured a decree for his clients in that case, and again in the consolidated cases; and that one attorney, also a party, would receive a fee for having enjoined a money decree theretofore entered in his favor; that the inevitable result of the injunction would be to cause great delay in enforcing the decrees in the *Hutchinson* and *Chicago City Bank* cases and in the two Federal cases, and would entail great and needless expense and protracted and bitterly contested litigation; that many of the parties

to the *Hutchinson* case, in reliance upon the final decree entered therein, had assigned their decretal judgments to others; that plaintiffs and their counsel were not only prejudicing respondents, but were seeking personally to profit at the expense of respondents from the successful proceedings in the State and Federal courts which had been pioneered and carried on by the parties to those cases at great expense and perseverance; that the money decrees in the *Hutchinson* case in favor of respondents Western Shade Cloth Company and Victor S. Peters were unit judgments which included *pro rata* recovery on playground warrants; that because of that fact the injunction against educational and building warrants would prevent enforcement of the playground warrant portion of the judgment, since they could not be separated; that the injunction would have the effect of suspending the proceedings of the Board for the issuance of its bonds; and as having a bearing upon the equities, the answer sets forth the great discrepancy between the holdings of plaintiffs and those of the group sought to be enjoined, points out that plaintiffs held $46,000 of warrants and their intervening coplaintiffs held $76,000, or a total of $122,000, as against warrants in the sum of $8,875,000 owned and held by parties to other cases; that 88 per cent of the outstanding warrants were owned by parties to other cases and only twelve one-hundredths of one per cent owned or held by plaintiffs; that two distributions of current tax collections had been made pursuant to the supplemental decree in the district court; that plaintiffs and intervenors had accepted and received their shares; that having done so they were bound by the decree and charged with full notice of the proceeding; that parties to the other cases are not in the same position as plaintiffs since many of them have taken judgments on the warrants and otherwise changed their positions; that

plaintiffs are asserting rights against rather than on behalf of respondents; that the consolidated cause differs from the other causes in that the other pending suits are against the Board alone while the consolidated causes include numerous defendants who are alleged to have received payment in full for warrants held by them; that consequently plaintiffs are not true representatives of the class; denied that they have obtained or could obtain any priority or preference by virtue of the decrees entered and to be entered against the Board in other cases, since the claims of respondents and all other holders of unpaid warrants are purely individual claims; alleged that they did not seek and have not secured any interest in a common fund, but have merely sought and secured an individual money judgment, and that all holders of unpaid warrants are entitled to the same judgment against the Board; that respondents are not interested in the alleged causes of action sought to be enforced against former holders of warrants, preferring to rely upon the individual judgments against the Board and upon the distribution of current tax collections pursuant to the supplemental decree in the *Railway* case; that since they assert no such purported causes of action as set forth in count II it could not be said they were interfering therewith; that the relief sought against the Board under counts I of the consolidated complaints is precisely the same as has been decreed in the two State and two Federal court cases, and the same as is being sought in the other pending cases.

As plaintiffs did not file a reply to the answers of respondents the allegations thereof stand admitted.

Respondents argue that the consolidated causes do not state a true representative suit. If the contention is valid it follows that the temporary injunction should not have been allowed. The terms "representative suit" and "class suit" are used interchangeably.

Generally the word "representative" refers to the named individuals actually bringing the action, while the word "class" embraces the entire group which the named persons purport to represent. Hence, such an action is "representative" in that the named persons represent all those in the class, and it is a "class" action in that all persons in the class are before the court by representation. A representative action is not such merely because the parties so designate it. Whether it falls into that category depends on the facts of the particular case. In a true (plaintiff) class action those who are within the class should not be made defendants, as they are in court through the actions of their representatives. Both parties cite the scholarly exposition of the law by Mr. Justice Story in his Commentaries on Equity Pleadings and draw therefrom support for their respective theories. As pertinent to the discussion we quote certain language taken from Story's Equity Pleadings (9th Ed.):

"Sec. 76a. [p. 71] The general rule, in courts of equity, as to parties, is that all persons materially interested in the subject-matter, ought to be made parties to the suit, either as plaintiffs, or as defendants, however numerous they may be, in order, not only that complete justice may be done, and that multiplicity of suits may be prevented; or, as the rule was once stated by Lord Hardwicke, that all persons ought to be made parties before the court, who are necessary to make the determination complete, and to quiet the question. . . .

"Sec. 76b. [p. 72] It has also been suggested, that it would be a more just exposition of the general rule, to declare that all persons interested in the object of the suit ought to be made parties. Undoubtedly this does furnish a safe and satisfactory guide in many cases of ordinary practice; but it may admit of doubt whether it is universally true, or whether it is **not**

equally as open to criticism as is the common formulary, in which the rule is expressed. . . .

"Sec. 76c. [p. 73] The truth is, that the general rule in relation to parties, does not seem to be founded on any positive and uniform principle; and therefore it does not admit of being expounded by the application of any universal theorem, as a test. It is a rule founded partly in artificial reasoning, partly in considerations of convenience, partly in the solicitude of courts of equity to suppress multifarious litigation, and partly in the dictate of natural justice, that the rights of persons ought not to be affected in any suit, without giving them an opportunity to defend them. Whether, therefore, the common formulary be adopted, that all persons materially interested in the suit, or in the subject of the suit, ought to be made parties, or that all persons materially interested in the object of the suit, ought to be made parties, we express but a general truth in the application of the doctrine, which is useful and valuable, indeed, as a practical guide, but is still open to exceptions, and qualifications, and limitations, the nature and extent and application of which are not, and cannot, independently of judicial decision, be always clearly defined. On this account it is of great importance to ascertain, what are the admitted exceptions to the general rule, and to ascertain what are the grounds on which they are founded; for when these exceptions, and the grounds thereof, are fully seen and explained, they will furnish strong lights to guide us in our endeavors to apply the rule and the exceptions to new cases, as they arise in judgment. . . .

"Sec. 77. [p. 78] . . . All these exceptions will be found to be governed by one and the same principle, which is, that, as the object of the general rule is to accomplish the purposes of justice between all the parties in interest, and it is a rule founded, in some

sort, upon public convenience and policy, rather than upon positive principles of municipal or general jurisprudence, courts of equity will not suffer it to be so applied as to defeat the very purposes of justice, if they can dispose of the merits of the case before them without prejudice to the rights or interests of other persons, who are not parties, or if the circumstances of the case render the application of the rule wholly impracticable. On the other hand, if complete justice between the parties before the court cannot be done without others being made parties, whose rights or interests will be prejudiced by a decree, then the court will altogether stay its proceedings, even though those other parties cannot be brought before the court; for in such cases the court will not, by its endeavors to do justice between the parties before it, risk the doing of positive injustice to other parties not before it, whose claims are or may be equally meritorious.

. . .

"Sec. 96. In truth, the same general principle pervades the whole course of equity proceedings, in all these apparently irreconcilable or anomalous cases. It has been well observed, that the general rule, being established for the convenient administration of justice, ought not to be adhered to in cases, in which, consistently with practical convenience, it is incapable of application; for then it would destroy the very purpose for which it was established. The exceptions, therefore, turn upon the same principle, upon which the rule is founded. They are resolvable into this, either that the court must wholly deny the plaintiff the equitable relief, to which he is entitled, or that the relief must be granted without making other persons parties. The latter is deemed the least evil, whenever the court can proceed to do justice between the parties before it, without disturbing the rights or injuring the interests of the absent parties, who are equally

entitled to its protection. And even in the cases in which the court will thus administer relief, so solicitous is it to attain the purposes of substantial justice, that it will generally require the bill to be filed, not only in behalf of the plaintiff, but also in behalf of all other persons interested, who are not directly made parties (although in a sense they are thus made so), so that they may come in under the decree, and take the benefit of it, or show it to be erroneous, or entitle themselves to a rehearing. The court will go further, and in such cases, it will entertain a bill, or petition, which shall bring the rights and interests of the absent parties more distinctly before the court, if there is any certainty, or even any danger, of injury or injustice to them. We shall presently see this doctrine fully borne out, when we advert to the cases, which illustrate the nature, and character, and extent of this class of exceptions.

"Sec. 97. [p. 95] The most usual cases arranging themselves under this head of exceptions are, (1.) where the question is one of a common or general interest, and one or more sue, or defend for the benefit of the whole; (2.) where the parties form a voluntary association for public or private purposes, and those, who sue, or defend, may fairly be presumed to represent the rights and interests of the whole; (3.) where the parties are very numerous, and although they have, or may have separate, distinct interests; yet it is impracticable to bring them all before the court.

"Sec. 98. [p. 95] In the first of this class of cases, may be included suits brought by a part of the crew of a privateer against prize agents for an account, and their proportion of the prize money. In a case of this nature, if the bill be brought by a few of the crew, on behalf of themselves only, it will not be sustained. But if it be brought on behalf of themselves, and all the rest of the crew, who had signed the articles, and

had not received their shares of the prize money, it will be sustained, from the manifest inconvenience of adopting any other course. And as it has been well observed, that no case can call more strongly for indulgence, than where a number of seamen have interests in the same subject-matter; for their situation at any period, how many are living at any one given time, how many are dead, and who are entitled to representation, cannot ordinarily be ascertained.

"Sec. 99. [p. 96] Similar reasons have induced the court to depart from the general rule in another class of cases, where the suit is brought on behalf of many persons in the same interest, and all the persons answering that description cannot easily be discovered or ascertained. Thus, a few creditors may maintain a suit on behalf of themselves and all the other creditors of a deceased debtor, against his proper representatives for an account and application of his assets, real as well as personal, in payment of their demands.
. . .

"Sec. 107. [p. 107] The second class of cases, constituting an exception to the general rule, and already alluded to, is, where the parties form a voluntary association for public or private purposes, and those who sue or defend, may fairly be presumed to represent the rights and interests of the whole. In cases of this sort the persons interested are commonly numerous, and any attempt to unite them all in the suit would be, even if practicable, exceedingly inconvenient, and would subject the proceedings to the danger of perpetual abatements, and other impediments, arising from intermediate deaths, or other accidents, or changes of interest. Under such circumstances, as there is a privity of interest, the court will allow a bill to be brought by some of the parties on behalf of themselves and all the others, taking care, that there shall be a due representation of all substantial

interests before the court. And such a bill must be brought on behalf of all the parties in interest; for if it be brought for the plaintiffs alone, it will not be sustained by the court for want of proper parties.

. . .

"Sec. 120. [p. 115] The third class of cases already alluded to as constituting an exception to the general rule, as to parties, is, where the parties are very numerous, and although they have, or may have, separate and distinct interests, yet it is impracticable to bring them all before the court, and, on this account, they are dispensed with. In this class of cases, there is usually a privity of interest between the parties; but such a privity is not the foundation of the exception. On the contrary, it is sustained in some cases, where no such privity exists. However, in all of them there always exists a common interest, or a common right, which the bill seeks to establish and enforce, or a general claim or privilege, which it seeks to establish, or to narrow, or take away. It is obvious, that under such circumstances, the interests of persons, not actual parties to the suit, may be in some measure affected by the decree; but the suit is nevertheless permitted to proceed without them, in order to prevent a total failure of justice. Indeed, in most, if not in all, cases of this sort, the decree obtained upon such a bill will ordinarily be held binding upon all other persons standing in the same predicament, the court taking care that sufficient persons are before it, honestly, fairly, and fully, to ascertain and try the general right in contest.

"Sec. 121. [p. 116] Thus, for example, bills have been permitted to be brought by the lord of a manor against some of the tenants, or *vice versa,* by some of the tenants on behalf of themselves and all the other tenants, against the lord, to establish some right; such, for instance, as a bill with regard to suit

to a mill, or a right of common, or a right to cut turf. In like manner, a bill has been permitted to be brought by the parson of a parish against some of the parishioners, to establish a general right to tithes, and the others have been bound by the decree made in the suit; and conversely, a bill has been permitted to be brought by some of the parishioners, on behalf of all, against the parson, to establish a parochial modus. So, where all the inhabitants of a parish had a right of common under a trust, a suit has been permitted to be brought by one, on behalf of himself and all the other inhabitants. In all these cases, although there were, or might be, distinct interests in the different tenants or parishioners; yet there was a general right and privity between them, as to the claim, asserted in the bill; and, therefore, the suit was held to be well instituted. . . .

"Sec. 124. [p. 118] But bills have also been allowed to be brought (called bills of peace), where there has been a general right claimed by the plaintiff, and yet no privity existed between the plaintiff and the defendants, and no general right on the part of the defendants, and where many more were, or might be concerned, than those brought before the court. In such cases, however, the right claimed by the plaintiff affected the defendants and all others in the same way, and they had, or might have, a common interest to resist it. Thus, for example, the city of London brought a bill to establish its right to a certain duty, and the bill was against a few persons only, who dealt in those things, of which the duty was claimed; and the bill was maintained by the court, notwithstanding the objection, that all the subjects of the realm might be concerned in the right. In such a case, a great number of actions might otherwise be brought, and almost interminable litigation would ensue; and, therefore, the court suffered the bill to

proceed, although the defendants might make distinct defences, and although there was no privity between them and the city.

"Sec. 125. [p. 119] So, where a bill was brought to quiet the plaintiffs' right of fishery in the river Ouse, of which the plaintiffs claimed the sole fishery for a large tract against the defendants, who (as the bill suggested) claimed several rights, either as lords of manors, or as occupiers of the adjacent lands, and also for a discovery and account of the fish, which they had taken; an objection was taken, that there was no privity between the defendants, but that the bill treated them as distinct trespassers, and that there was no general right to be established against them. The court, however, sustained the bill; for there was a general right of a sole fishery asserted by the plaintiffs against all the defendants; and the defendants were not precluded from setting up distinct exemptions and distinct rights in their defence. The benefit to be obtained by such a bill, under such circumstances, is, that they may furnish a ground to quiet the general right, not only as to the persons before the court, but as to all others in the same predicament.

"Sec. 126. [p. 120] In all these classes of cases, it is apparent, that all the parties stand, or are supposed to stand, in the same situation, and have one common right, or one common interest, the operation and protection of which will be for the common benefit of all, and cannot be to the injury of any. It is under such circumstances, and with such objects, that the bill is permitted to be filed by a few, on behalf of themselves and all others, or against a few, and yet to bind the rights and interests of the others. But, if the bill is filed by the plaintiffs, on behalf of themselves only, and not on behalf of all the other persons in interest, the bill would be unmaintainable, and be held bad on demurrer. . . .

"Sec. 130. [p. 123] But although the numerousness of parties, as well as their being unknown, constitutes, or may constitute, a good ground for dispensing with their being made actual parties to a suit in the classes or cases before mentioned; yet as has been already stated, this exception has not been allowed to operate, without such qualifications, where the decree must directly affect the interests of the persons not before the court, and they have a right and an interest to be heard before the decree is made. A few illustrations of these qualifications upon the generality of this exception may here be properly suggested from adjudged cases.

"Sec. 131. [p. 123] Thus, for example, where a suit was brought by a few members of a voluntary society, called the Benevolent Union Society, consisting of sixty-one members, on behalf of themselves and all other members, for an account and injunction against the six defendants, who were trustees and members of the society, intrusted with the stock of the society, who had, in breach of the articles of the society, sold out a part of it, and proceeded to dissolve the society; and it appeared, that by the articles it was a material part of the contract, that the society should never be dissolved, so long as seven members should support the same; and it further appeared, that all the other members (forty-seven in number), except the plaintiffs, had received their shares, and the plaintiffs' shares were in court. It was held, that all the other forty-seven members ought to have been made parties, as they had a direct interest in the decree to be made upon the bill, seeking, as it did, a replacement of the stock, and a continuance of the society. In such a case it is clear, that the real question was, whether there could be a dissolution of the partnership and a division of the funds, or not, consistently with the articles; and in that question

all the members had an equal interest to be heard, and to be protected.

"Sec. 131a. [p. 123] So, where one of thirty-eight proprietors of a newspaper was appointed bookseller, and received the moneys of the concern, it was held, on a bill brought by twelve of the proprietors on behalf of themselves and all the other proprietors for an account, that the remaining twenty-five proprietors ought to be made parties by name, since it did not appear that the suit was necessarily for their benefit.

"Sec. 132. [p. 124] Upon similar grounds it has been held, that a shareholder in a joint-stock company cannot file a bill on behalf of himself and all other shareholders for a dissolution of the concern; but they must all be made actual parties to the suit, however numerous, and however impracticable it may be under such circumstances to proceed to a decree; upon the ground that it is by no means a general principle in equity, that all cases within the same mischief, as to parties, are to be held relievable simply on account of their numerousness, if the parties not before the court have a substantial interest in the very question of right, on which the decree must hinge. But this doctrine seems open to great doubt and difficulty; and indeed it tends to make a rule, designed to attain the purposes of general justice, the instrument of an utter denial of all justice, where the interests of all parties are not, or may not be exactly coincident. It has been accordingly greatly qualified, if not positively overturned, in the more recent authorities."

An examination of the cases mentioned in the briefs discloses that nearly all of them rely on passages from Story's treatise. The authorities leave the impression that care must be exercised in applying the principles to the factual situations involved. We shall consider the principles discussed by Story in the light of the facts of this case. In *Rothschild v. Village of*

*Calumet Park,* 350 Ill. 330, which case involved special assessment bonds, the court said (pp. 341, 342):

". . . When the municipality which has made the improvement and collected the money to pay the bonds used in its construction fails in its duty to pay the bondholders, the latter may enforce their rights in accordance with the rules which prevail in other cases where money has been received to the use of another and retained without his knowledge.

"Objection is also made to the decree because it is said that it does not appear that the city has paid the money it has collected to bondholders other than the defendant in error or that it has improperly paid to other bondholders more than their proportionate share. That is no answer to the claim of the defendant in error. His complaint is that the village collected the money for the payment of all the bondholders *pro rata* and that it did not pay him *pro rata*— not that it paid somebody else more than his share. It is argued that the burden of proof is on the complainant to show that the money had been improperly applied elsewhere. This is not so. When the defendant in error had shown that the village collected the money applicable to the payment of his bonds and had not paid them, he had met the burden imposed upon him and was entitled to judgment unless the plaintiff in error showed a valid defense." And in *Norfolk & W. Ry. Co. v. Board of Education,* 14 F. Supp. 475, which involved the warrants and liability in the case at bar, Judge Woodward said (p. 480):

"It appears from the above cases that it is not essential that the complainant show that the city of Chicago and board of education has misapplied the taxes collected. Whether defendants have paid other warrant holders more than their proper share is immaterial to plaintiff's case. The gist of the plaintiff's cause of action is that the defendants have re-

ceived taxes from the 1929 levy against which plaintiff's warrants were issued and the defendants have not paid the plaintiff its pro rata share of such taxes actually received by defendants. This makes out a complete case warranting recovery in favor of the plaintiff and the burden is upon the defendants to show, if they can, a defense to such case.

"The court holds that the plaintiff is entitled to recover from the city of Chicago and the board of education its pro rata share of all moneys received by the defendants applicable to the payment of 1929 educational and building warrants as for money had and received to the use of plaintiff, and hence is entitled to an accounting." Hence the liability of the Board is unaffected by what it did with the tax funds, the use to which the Board put the tax fund being immaterial in determining the liability to each unpaid warrant holder. Plaintiffs' position that the liability of the Board to each unpaid warrant holder is to be reduced in an amount equal to the sum recovered from the paid warrant holders is untenable. The liability of the Board to each warrant holder is a personal liability in which no other warrant holder has an interest. The recovery by one warrant holder does not affect the right of another warrant holder to sue the Board and recover a judgment for the full amount of his claim. The liability of the municipality to warrant holders is unlimited and not affected by the measure of recovery in cases to which they are not a party. The stockholders cases cited by plaintiffs are not helpful. They are on an entirely different basis from the case at bar. The taxpayer cases also fall into a special classification. The rule requiring joinder of parties is relaxed in some cases in order to afford a remedy. We do not know of any case under the third classification of Story where it has been held that numerousness of parties alone is sufficient ground for

prosecuting a class action. Respondents do not care to proceed on the theory advanced in count II of the complaint. Plaintiffs, and others who may wish to join them as actual parties, may proceed with their action in an endeavor to recover from the paid warrant holders. The position of respondents is that if and when plaintiffs or others move against them in an effort to "restore the trust fund" respondents will meet the situation then presented. The paid warrant holders are widely scattered throughout the United States and it is manifest that the expense of suing them, trying the cases where necessary, recovering judgments, and collecting the judgments, would be very great. Plaintiffs include in the class they seek to represent unpaid warrant holders who received payment of some warrants formerly held by them. It is obvious that in asserting a right to recover against such warrant holders (without bringing them into the action as actual parties) a portion of the payments received from the Board and to deduct from the amount due on unpaid warrants the excess received on paid warrants, plaintiffs in the consolidated cases are confronted with a conflict of interest. It is well established that in a class action the plaintiffs should not introduce any question of priority or any matter which may give rise to a contest or opposition between themselves and any of those whom they wish to represent. (Calvert on Parties in Equity, p. 38.) Under plaintiffs' theory, at best, respondents' right to recover will be postponed for an indefinite period. The effect of plaintiffs' suit is to deprive respondents and other unpaid warrant holders of their liberty of action. The theory of plaintiffs' consolidated cause is entirely at variance with the theories and rights of the other unpaid warrant holders. Here let us recall the language of the court in *Hale v. Hale,* 146 Ill. 227, 257:

"A familiar illustration may be found in cases where the parties are so numerous that it is inconvenient or impossible to bring them all before the court, and it appears that they all stand in the same situation, and have one common right or one common interest, the operation and protection of which will be for the common benefit of all, *and can not be to the injury of any.*" (Italics ours.) Viewing the facts disclosed by the record in this case, how can it be said that the prosecution of the consolidated causes to the exclusion of all other causes, will be for the common benefit of all and not to the injury of any? It appears clear under the authorities that unpaid warrant holders have a choice to proceed against the Board or to attempt to effect a partial recovery against paid warrant holders, and cannot be forced to proceed against their will to adopt either remedy to the exclusion of the other, or be forced to pursue a third remedy consisting of a combination of the others. We are not called upon in this appeal to pass on the proposition as to whether paid warrant holders can be required to account on a *pro rata* basis to those who have not been paid. The assumption is that the officers, attorneys and trustees of the Board are performing their duties as public servants. If someone should demand that the Board sue the "paid" warrant holders in order to recover the excess payments and the Board declined to act, it has been suggested that the question as to whether the Board could be compelled to sue could then be raised by a mandamus action.

Bearing in mind that the answers deny that the Board is insolvent, that the liability to warrant holders has been established, that the Board is not contesting any cases where liability is asserted, and that in the proposed class suit involved and expensive litigation will be necessary, it becomes apparent that the remedy afforded in the consolidated causes is less

efficacious than the remedy afforded to those who are unwilling to join therein. From the authorities we are satisfied that the facts in the instant case are not such as to warrant the bringing of a representative suit. The only basis for the injunction is to protect the asserted exclusive jurisdiction of the court on the theory that all warrant holders are before the court as members of the class represented by the individual plaintiffs. As the consolidated causes are not true class actions, it follows that the prosecution of other suits and the enforcement of other decrees may not be enjoined.

Respondents also advance the contention that plaintiffs and intervenors are guilty of laches because of unreasonable delay in applying for the injunction. Plaintiffs knew that the respondents' cases were filed and that respondents were incurring expense in prosecuting such cases and knew that some of the cases had gone to decree. It appears that respondents paid attorneys' fees and incurred other expenses, although the amounts are not specified. Under all the circumstances here disclosed we find that plaintiffs were guilty of laches in applying for the injunction and thereby respondents incurred expense, judgments were assigned, and warrants were stamped with a notation of judgment; all of which could have been avoided if plaintiffs had sought the injunction in due season.

In passing on the motion for an injunction in a case of this nature it was incumbent on the chancellor to carefully consider the equitable positions of the parties. Those who seek to represent the class hold and own less than one per cent of the warrants. That fact alone would not, of course, prevent them from maintaining a class action. However, considered in connection with all the other facts and circumstances in the case it is clear that plaintiffs could not become champions of the rights of all in the class. The briefs

are voluminous and many other points are raised, all of which have been considered by the court. However, the views expressed on the points discussed dispose of the appeal and make it unnecessary to further extend this opinion.

Therefore the order of the circuit court of Cook county entered June 21, 1938, granting a temporary injunction should be and it is reversed.

*Order reversed.*

JOHN J. SULLIVAN and FRIEND, JJ., concur.